508 A.2d 1167

COMMONWEALTH of Pennsylvania, Appellee,

v.

**Roger Peter BUEHL, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 1985.

Filed April 30, 1986.

364

Richard M. Lovenwirth, Pottstown, for appellant.

Joseph A. Smyth, Jr., Dist. Atty., Larry J. Folmar, Asst. Dist. Atty., Ronald T. Williamson, Chief/Appeals Div., Asst. Dist. Atty., William R. Carpenter, Norristown, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

## I. INTRODUCTION

This direct appeal arises from the conviction and death sentence of Roger Peter Buehl (Appellant) on three counts of murder of the first degree pursuant to 42 Pa.C.S. § 9711(h).[1] Appellant was arrested on September 8, 1982,

1. 42 Pa.C.S. § 9711(h) provides:
 (h) *Review of death sentence.—*

and charged with Murder of the First Degree,[2] Burglary,[3] Robbery,[4] Possession of an Instrument of Crime,[5] Violation of the Uniform Firearms Act,[6] and various other related offenses. Appellant was tried before a jury with the Honorable Samuel W. Salus, II, of the Court of Common Pleas of Montgomery County, presiding. On January 18, 1983, Appellant was found guilty of murder of the first degree for the killings of Courtland Gross and Alexandra Gross, husband and wife, and their housekeeper, Catherine VanderVeur. Appellant was also found guilty of several related offenses. Immediately thereafter, a separate sentencing proceeding was commenced pursuant to 42 Pa.C.S. § 9711(a)(1),[7] following which the jury determined that the Appellant be sentenced to death on each of the three murder of the first degree convictions. Formal sentencing was deferred pending the filing and disposition of post-trial motions. On June 17, 1983, the post-trial motions were

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

2. 18 Pa.C.S. § 2502.

3. 18 Pa.C.S. § 3502.

4. 18 Pa.C.S. § 3701.

5. 18 Pa.C.S. § 907.

6. 18 Pa.C.S. §§ 6103, 6104, and 6106.

7. Section 9711(a)(1) provides:

(a) Procedure in jury trials.—

(1) After a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.

argued before a court *en banc* which denied same on October 13, 1983. Appellant was sentenced to three consecutive death sentences on the convictions of murder of the first degree, and concurrent sentences of ten to twenty years each on the burglary and robbery convictions on December 14, 1983. Sentence on each of the remaining convictions either merged or was suspended. This automatic appeal followed.

Appellant challenges the verdicts below on numerous grounds. These challenges pertain to alleged errors at both the guilt and sentencing phases of the trial. For the reasons set forth herein, we affirm Appellant's convictions of murder of the first degree, and uphold the sentences of death.

The evidence produced at trial discloses the following. On July 16, 1982, the bodies of Courtland Gross, aged seventy-nine years, his wife, Alexandra Gross, aged sixty-eight years, and their housekeeper, Catherine VanderVeur, aged sixty-nine years, were found shot to death at the Gross estate in Lower Merion Township, Villanova, Pennsylvania. It was determined that the three had died sometime during the mid-afternoon or evening of July 15, 1982. Courtland Gross's body was found in an area above the cellar steps. He had been shot three times: once above the right heel, once in the abdomen, and once in the left cheek. Mrs. Gross's body was found in the kitchen. She had been shot twice: once in the left elbow and once in the right eye. Mrs. VanderVeur's body was found in a back bedroom tied to a chair by scarves. She had been shot once in the back of the head. Several of the rooms were in disarray. Drawers had been pulled out of cabinets in the bedrooms and bathrooms and their contents strewn about. A dropcloth on a safe in the basement had been pulled aside revealing its handles and the dial. Six bullets and six .380 cartridge casings were recovered from the bodies and the rooms where the bodies were found. There were no eyewitnesses to the killings. However, the prosecution was able to piece

together a complicated trail of circumstantial evidence which was the basis of Appellant's convictions.

On or about June 1, 1982, Francis Kelly purchased a .380 caliber Walther PPK automatic pistol, which he test fired at a junkyard on or about June 7, 1982. On August 12, 1982, Kelly and the police returned to the junkyard and recovered two .380 shell casings which ballistics experts determined had come from the same gun that had fired the casings found at the Gross estate.

On July 7, 1982, Joseph Dwyer stole a red Buick Skylark from the vicinity of Ninth and Pine Streets, Philadelphia. He slightly damaged the left-front tire and lost the hubcap. On July 8, 1982, Dwyer sold the Skylark to Kelly. On July 10, 1982, Kelly lent the Skylark to Appellant, and the Walther PPK loaded with a full clip of ammunition. Dwyer testified that he saw both items in Appellant's possession on July 10, 1982. He further stated that Appellant asked him to help commit robberies, specifically a "job on Pine Street" and a "place up Montgomery County" where Appellant would force people to "open the safe." Dwyer declined.

On July 13, 1982, Appellant met with Joseph La Motte at La Motte's office in Philadelphia. Appellant told La Motte he was driving a red Skylark which La Motte observed from his office window. Also on July 13, 1982, Appellant purchased fifty cartridges of 9mm Luger ammunition from Michael Bradford, assistant manager of Pearson's Sporting Goods Store. This ammunition did not fit Appellant's gun and Bradford recommended 9mm short (which is .380 caliber) ammunition. Appellant exchanged the ammunition and was issued a credit slip in the amount of $4.45. Appellant signed the required form but his signature was illegible. Bradford asked for Appellant's driver's license and printed Appellant's name under the signature on the federal register.

On July 13, 1982, around 6:00 p.m., Appellant entered the Good Scents Shop on Pine Street in Philadelphia. Antoinette Fucci Quinn and Nathan Cohn attended the store. After requesting several items, Appellant pulled a gun and

demanded that Ms. Quinn put the items, plus the contents of the cash register, into a paper shopping bag. Before Appellant left the store, he shot Nathan Cohn above the left ankle, saying, "I'm not playing around." He told Ms. Quinn, "If anybody comes out here, I'll blow your eyes out." Appellant was observed by John Lyons leaving the shop with a paper shopping bag and speeding away in a red car. It was determined by ballistics experts that the two cartridge cases recovered from the store were ejected from the same gun that had ejected cartridges at the junkyard and the Gross estate.

On July 15, 1982, around 2:00 p.m., David Mazzocco saw a red car driving slowly down his street, Berks Road in Worcester Township. He noticed that the car was missing its left-front hubcap. On that same afternoon around the same time, Richard Kirkpatrick arrived at his home on Berks Road. He saw a red Skylark in his driveway. Upon entering his home, he was confronted by a man with a pistol, who ordered Kirkpatrick to turn around and then blindfolded him. The gunman said, "I've shot two other people, I'll shoot you also. I'll start with your leg and work up." The gunman did not carry out this threat but he stole some of Mrs. Kirkpatrick's jewelry and left. At the Kirkpatrick home, three cartridge casings were found, which were determined to have been ejected from the same pistol that ejected casings at the junkyard, the Good Scents Shop, and the Gross estate.

On July 15, 1982, Mr. and Mrs. Gross attended a funeral in Bryn Mawr, Pennsylvania, around 11:00 a.m. At approximately 2:30 p.m., an elderly woman wearing a flowered dress and straw hat purchased a box of Domino brown sugar at the Liberty Bell Meat Market in Bryn Mawr. This market is about 1.5 miles from the Gross estate. When her body was discovered on July 16, 1982, Mrs. Gross was wearing a flowered dress and a straw hat was near her head. Also, the brown sugar was found still in its paper bag on the kitchen counter. There was testimony at trial that the Grosses ran their house in a very neat and methodi-

cal way. Testimony also established that Mrs. Gross carried a gold money clip embossed with the image of St. Christopher. This clip was missing.

Joseph La Motte testified that on July 15, 1982, between 3:30 and 4:00 p.m., Appellant came to La Motte's office in a very nervous and excited state. He asked to borrow La Motte's car, a gray 1982 Datsun. When La Motte refused, Appellant said he had "just pulled a job" and he "had to go back and wipe off the fingerprints." When asked why he could not use his own car, Appellant stated that the red Skylark was a stolen car and he did not want to get stopped by the police. When La Motte still refused, Appellant said, "Look, this is my life we're talking about. I just wasted three people and I want your car." La Motte testified that Appellant had a gun in the waistband of his jeans and told La Motte that he would be driving to Conshohocken, which exit from the Schuylkill Expressway is about 1.5 miles from the Gross estate. The Commonwealth produced testimony that it is possible to drive from La Motte's office, at Fourth and Chestnut Streets, to La Motte's house, at Eighth and Catherine Streets, and then to the Gross estate in thirty-six minutes observing the posted speed limits.

Donna Bush testified that on July 15, 1982, at approximately 5:00 p.m., she observed a car that looked like La Motte's, traveling quickly away from the Gross estate.

Appellant arrived in the Datsun at the corner of Fifth and Chestnut on July 15, 1982, between 5:00 and 5:30 p.m., where La Motte and Joseph Lynch were waiting. Appellant had a pistol in the waistband of his pants. At approximately 5:35 p.m., Mary Treat entered the Datsun at the corner of Fourth and Chestnut, at which time she was introduced to Appellant. At trial, Ms. Treat testified that he was nervous and crusty looking. Later that evening, at approximately 7:00 p.m., Appellant sold jewelry to Avrum Kay at Kay's shop at 725 Sansom Street in Philadelphia. Some of the jewelry was later identified as that which was taken in the Kirkpatrick robbery earlier that day.

On July 17, 1982, Appellant called La Motte from Atlantic City, New Jersey, and asked if there had been "any big burglaries or anything on the news." La Motte asked Appellant if he knew anything about the triple homicide at the Gross estate, but Appellant would not answer.

Duon Miller testified that he met Appellant on July 17, 1982, while vacationing in Atlantic City, and spent part of the next six days with him. Appellant, having run out of gambling money, advised Miller that someone on Sansom Street in Philadelphia owed him money. Miller drove Appellant to Philadelphia. Appellant told Miller he had killed people with a PPK and had thrown it into a lake or river. He also asked Miller if he had ever heard of the Gross family. Appellant offered Miller a St. Christopher money clip, which Miller later found in his car and put into his briefcase. Upon their return to Atlantic City, Appellant and Miller had several arguments over money and Appellant threatened to "get his PPK and come back and blow Miller away." Miller traveled to Zurich on August 5, 1982, and while he was in Zurich, Eros Peter Simone observed the St. Christopher money clip in his briefcase.

On July 19, 1982, Peter Anthony Ross met Appellant at the Tropicana Hotel in Atlantic City. Ross saw Appellant at approximately 11:00 p.m., intently watching television, switching from newscast to newscast. Ross also witnessed three arguments between Miller and Appellant, during which Appellant threatened to kill Miller with a PPK. Appellant told Ross that he had Miller's vehicle registration and could track Miller down and kill him. Appellant also admitted to Ross that he had murdered before.

On July 30, 1982, Appellant was arrested for burglary in Delaware County. At the time of his arrest, Appellant had in his possession a credit slip for $4.45 from Pearson's Sporting Goods Store, a paper with Miller's name and address and telephone number on it, and Miller's vehicle registration card.

On August 17, 1982, while Appellant was being transferred to Broadmeadows prison, he asked one of the detectives if the police could match shell casings.

Appellant admitted to the commission of the armed robbery of the Good Scents Shop, and the shooting of Nathan Cohn, but denied any involvement in the Kirkpatrick robbery or the killings at the Gross estate.

■ The jury found Appellant guilty on each of three counts of murder of the first degree, and the same jury determined that Appellant be sentenced to death on each count. While Appellant does not specifically challenge the sufficiency of the evidence to sustain this verdict, we have, nevertheless, reviewed the record for sufficiency and find compelling evidence to support the jury's verdict beyond a reasonable doubt. Furthermore, the evidence proves beyond a reasonable doubt a willful, premeditated, deliberate, and specific intent to kill on the part of Appellant. Admittedly, there were no eyewitnesses to the murders. However, the Commonwealth need not prove its case directly. Circumstantial evidence can be as reliable and persuasive as eyewitness testimony and may be of sufficient quantity and quality to establish guilt of a crime beyond a reasonable doubt. *Commonwealth v. Pronkoskie,* 498 Pa. 245, 445 A.2d 1203 (1982); *Commonwealth v. Berrios,* 495 Pa. 444, 434 A.2d 1173 (1981); *Commonwealth v. Pacquette,* 451 Pa. 250, 301 A.2d 837 (1973); *Commonwealth v. Cimaszewski,* 447 Pa. 141, 288 A.2d 805 (1972).

## II. VENUE CHANGE

Appellant first argues that because of the unusual nature of the case, the magnitude of publicity it received, the close proximity of the murders, and the stature of the victims in the community, the trial court erred in refusing to grant his motion for a change of venue without a hearing. We do not agree.

■ The grant or denial of change of venue is a matter within the sound discretion of the trial court, and its exer-

cise will not be disturbed by an appellate court in the absence of an abuse of discretion. *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985); *Commonwealth v. Romeri*, 504 Pa. 124, 470 A.2d 498 (1983); *Commonwealth v. Bachert*, 499 Pa. 398, 453 A.2d 931 (1982); *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Hoss*, 469 Pa. 195, 364 A.2d 1335 (1976). The trial judge is in the best position to assess the community atmosphere and judge the necessity for a venue change. *Commonwealth v. Rigler*, 488 Pa. 441, 412 A.2d 846 (1980). The mere existence of pre-trial publicity does not warrant a presumption of prejudice. *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978). This Court has recognized three types [8] of inherently prejudicial materials which would obviate the need for a defendant to demonstrate actual juror prejudice. However, the trial judge determined that there was an absence of these types of materials. In support of the decision not to hold a pre-trial hearing on the change of venue motion, the trial judge set forth the following reasons: 1) fear that the hearing itself would contribute to the prejudicial publicity which was sought to be avoided; 2) a preference to focus on the actual effect of any publicity on individual jurors as revealed in the voir dire examination rather than speculate; 3) an absence of the three types of inherently prejudicial materials. The court determined that the pre-trial publicity was not so extensive so as to cause irreparable harm to the defendant; therefore, the motion was denied.

■ The court, however, offered to reconsider the motion after voir dire examination if it were determined that prejudice existed. The results of voir dire showed that a change of venue was not necessary. Of the eighty-five potential jurors who were individually examined, forty-eight said they knew something about the case, four said they knew noth-

---

**8.** (1) References to defendant's prior criminal record ... (2) references to information from police that a defendant had confessed ... (3) reports that go beyond objective reporting and become emotional and inflammatory ... *Commonwealth v. Rolison*, 473 Pa. 261, 268, 374 A.2d 509, 512 (1977).

ing about it, and thirty-three were not asked because they were excused for personal reasons. The forty-eight potential jurors were asked whether what they had heard would influence their decision during the trial. Four were excused on this ground. Of those who remained, most had little recollection beyond the fact that a wealthy couple and their housekeeper had been killed. Only a few recalled hearing Appellant's name in connection with the killings, and none knew all the details.

Appellant renewed his motion during voir dire examination, but has at no time presented any specific examples of actual prejudice. Further, Appellant was entitled to twenty-two peremptory challenges, Pa.R.Crim.P. 1126(a)(3) and 1108(b), but exercised only eleven of them. This would indicate that he was satisfied with the jurors selected. After a thorough review of the transcript of the voir dire, we find no evidence of either actual prejudice or pre-trial publicity that was so inherently prejudicial as to justify a presumption of prejudice which would serve as a basis for the substitution of the judgment of this Court for that of the trial court.

## III. INEFFECTIVENESS CLAIMS

Appellant next argues that his trial counsel was ineffective in numerous instances during both the guilt and sentencing phases of the trial, and that his death sentence should be vacated and a sentence of life imprisonment be imposed or, in the alternative, that a new trial be granted. Appellant's assertions of trial counsel's ineffectiveness include 1) conflict of interest, 2) failure to object to the "death qualification" procedure at voir dire, 3) failure to present evidence of Appellant's diminished capacity due to drug use, 4) failure to present points for charge and instructions to the jury at both phases, 5) failure to cross-examine a Commonwealth witness properly, 6) failure to present evidence of Appellant's character and diminished capacity as mitigating circumstances, and 7) failure to object to the court's deviation from the exact language of the Sentencing

Code, § 9711(e)(4). We disagree that trial counsel was ineffective.

■ When confronted with a claim of ineffective assistance of counsel, a reviewing court must first ascertain whether the issue underlying the charge of ineffectiveness is of arguable merit and, if so, it must be determined whether the course chosen by counsel had some reasonable basis designed to serve the interests of his client. *Commonwealth v. Stoyko*, 504 Pa. 455, 475 A.2d 714 (1984); *Commonwealth v. Wade*, 501 Pa. 331, 461 A.2d 613 (1983); *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977). There is a presumption in law that counsel is effective. *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981). The standard governing ineffectiveness claims was set forth by this Court in *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967):

Our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had *some reasonable basis* designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that the trial counsel's decision had any reasonable basis.

*Id.*, 427 Pa. at 604, 235 A.2d at 352–53. We also noted in *Maroney* that:

... for relief to be granted, *Appellant* must demonstrate that counsel's ineffectiveness worked to his prejudice....

*Commonwealth ex rel. Washington v. Maroney, supra*, 427 Pa. at 605 n. 8, 235 A.2d at 353 n. 8. *See also, Commonwealth v. Bandy*, 494 Pa. 244, 431 A.2d 240 (1981). The Supreme Court of the United States has established the same standard pursuant to federal constitutional strictures in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) *reh. den.*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864.

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.... Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. *Id.*, 466 U.S. at 691–692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696.

Further, counsel will not be considered ineffective for failure to assert a meritless claim. *Stoyko, supra,* 504 Pa. at 472, 475 A.2d at 723.

With the *Maroney* standard in mind, we will address Appellant's itemized list of ineffectiveness.

■ First, Appellant raises a conflict of interest as a ground of ineffectiveness. On November 5, 1982, Appellant was advised by both the trial court and the district attorney that a possible conflict of interest existed in that his trial counsel had represented Avrum Kay in August, 1982. This representation took place when Kay was interrogated by the police regarding his purchase of stolen items from Appellant. Appellant was further advised that Kay would so testify at trial. Appellant now asserts that despite his election to retain his counsel and waive the conflict of interest, it was not a knowing waiver because he was not advised that Kay would testify that Appellant admitted to Kay that he owned a Walther PPK gun. We find no merit in this claim. While it is true that prejudice is presumed when counsel is burdened by an actual conflict of interest, this is so only if the defendant demonstrates that counsel "actively represented conflicting interests" and "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 350, 348, 100 S.Ct. 1708, 1719, 1718, 64 L.Ed.2d 333 (1980). Appellant has made neither showing. This is not a case of dual representation by a single attorney. Counsel's representation of Mr. Kay terminated before Appellant retained him. Our examination of the record reveals that Appellant's defense was not prejudiced by the fact that, at a prior time, his counsel had represented a Commonwealth witness.

■ Appellant's assertion that trial counsel was ineffective for failing to object to the "death qualified" jury is likewise without merit. This Court has addressed and rejected this argument on numerous occasions. See, *Commonwealth v. Maxwell*, 505 Pa. 152, 477 A.2d 1309 (1984); *Commonwealth v. Jones*, 501 Pa. 162, 460 A.2d 739 (1983); *Commonwealth v. Brown*, 462 Pa. 578, 342 A.2d 84 (1975); *Commonwealth v. Kenney*, 449 Pa. 562, 297 A.2d 794 (1972); *Commonwealth v. Speller*, 445 Pa. 32, 282 A.2d 26 (1971). The voir dire of prospective jurors in capital cases is governed by settled case law. The United States Supreme Court has consistently held that simply questioning potential veniremen on their position regarding the death penalty, or excluding those who are strongly opposed to it and cannot impose it under any conditions, does not necessarily produce a prosecution-oriented jury. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). More recently, Justice Rehnquist, speaking for the Court in *Wainright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), stated the following:

> We therefore take this opportunity to clarify our decision in *Witherspoon* and to reaffirm the above quoted standard from *Adams* as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the jurors' views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that in addition to dispensing with *Witherspoon's* reference to "automatic" decision making, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity."

*Id.* 105 S.Ct. at 852. Thus, the position taken by Appellant has been specifically rejected by this Court and the United States Supreme Court.

■ Appellant next asserts that his trial counsel was ineffective for failure to present at the guilt stage of his trial evidence of his diminished capacity due to the use of

Methamphetamine. We do not agree. Counsel's trial strategy at all times during the trial was to obtain acquittal for Appellant, and his performance was consistent with the defense of innocence. Since the presentation of a defense of diminished capacity would concede criminal liability, *Commonwealth v. Walzack,* 468 Pa. 210, 360 A.2d 914 (1976), such presentation would eliminate the chance of an acquittal.

■ In reviewing trial counsel's strategy, we must place ourselves in the position of trial counsel at the time the strategy was formulated to determine if the alternative chosen was reasonable. *Commonwealth v. Lesko,* 502 Pa. 511, 467 A.2d 307 (1983). In light of the fact that there were no eyewitnesses to the crime, Appellant's fingerprints were not found at the scene of the crime, and the Commonwealth's case was based largely on circumstantial evidence, trial counsel's decision to forego the defense of diminished capacity in favor of an attempt to win outright acquittal was reasonable. Failure of counsel to present a particular defense is a tactical one, and will not be deemed ineffective assistance of counsel if there is a reasonable basis for that position. *Commonwealth v. Blair,* 491 Pa. 499, 421 A.2d 656 (1980).

■ There is no merit to the allegation that trial counsel was ineffective for failing to file points for charge at the guilt and the sentencing phases of the trial. There is no reasonable basis for trial counsel to submit points for charge which have already been adequately, accurately, and clearly presented to the jury. Our careful review of the entire record reveals that the charge to the jury at both phases was clear and complete in all respects. Where the charge and instructions to the jury are, in fact, adequate, counsel cannot be deemed ineffective for failing to request an adequate charge. *Commonwealth v. Beasley,* 504 Pa. 485, 475 A.2d 730 (1984).

■ Appellant's allegation that trial counsel was ineffective for failure to object to the court's instruction on age as

a mitigating factor is also without merit. With respect to its instructions, the trial court told the jury that "the youth or advanced age of the defendant at the time of the crime" can constitute a mitigating circumstance. The actual statutory language is "the age of the defendant at the time of the crime." 42 Pa.C.S. § 9711(e)(4). This Court has previously addressed this identical issue in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), *cert. den.*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296, and held that "... deviation from the language of the statutory instruction or a technical inaccuracy in the jury instruction which nevertheless adequately, accurately, and clearly expresses the law to the jury will not invalidate a sentence of death. *Commonwealth v. Zettlemoyer, supra*, at 500 Pa. [16] 46–50, 454 A.2d 937." *Id.*, 504 Pa. at 437, 475 A.2d at 704. Trial counsel cannot be deemed ineffective for failure to raise a meritless objection.

■ Appellant next asserts that counsel was ineffective for failure to cross-examine properly a witness, Joseph Lynch, thereby "opening the door" for the prosecution on redirect to elicit testimony which was previously ruled inadmissible hearsay. An examination of the record reveals that the cross-examination of Lynch was not deficient or lacking in tactical purpose so as to warrant a finding of ineffective assistance of counsel. Joseph La Motte testified that he lent Appellant his car on July 15, 1982, because Appellant told La Motte that "he had just wasted three people." In a statement given by Lynch to the police, he stated that La Motte told him what Appellant said about wasting three people. Lynch's testimony in this regard was excluded, *in limine*, as inadmissible hearsay. On cross-examination of Lynch, defense counsel elicited testimony that Appellant often borrowed La Motte's car. Counsel already had a ruling that Lynch's hearsay testimony would not be admitted. Armed with the benefit of this ruling, counsel's strategy was sound in attempting to show that it was not unusual for Appellant to borrow La Motte's car, and in attempting to impeach the testimony of both La Motte and

Lynch. The hearsay testimony was permitted on redirect to rebut a claim of recent fabrication on the part of La Motte, and because defense counsel had "opened the door" on cross-examination of Lynch. The cross-examination would have been extremely effective if the trial judge had not permitted the prosecution to go into the conversation that La Motte had with Lynch as to Appellant's purpose in borrowing the car *that* day. Although it failed, counsel made a reasonable tactical choice. We find no basis for a finding of ineffectiveness in this instance.

 Finally, Appellant claims that his trial counsel was ineffective in failing to present any mitigating evidence at the penalty phase of the trial, and because of the brevity and unpersuasiveness of counsel's closing argument. The record shows that counsel did, in fact, present evidence at the sentencing stage in mitigation of penalty. Appellant's testimony established his age at the time of the crime, which is a mitigating factor[9] upon which the jury was instructed. Appellant also testified as to his use of Methamphetamine on July 13, 14, and 15, 1982, the three days up to and including the date of the crime. Further, he described the effect that the drug had on him. Such information could have been considered as mitigating factors by the jury under § 9711(e)(2) and (3).[10] The jury, however, found no mitigating circumstances.

Appellant contends that he was entitled to counsel who would lay out for the jury and the court facts about Appellant upon which the jury could find mitigating circumstances. The fact that trial counsel did not present any

**9.** 42 Pa.C.S. § 9711 provides:
> (e) Mitigating circumstances—Mitigating circumstances shall include the following:
> (4) The age of the defendant at the time of the crime.

**10.** 42 Pa.C.S. § 9711(e)(2) provides:
> The defendant was under the influence of extreme mental or emotional disturbance.
> (3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

other witnesses concerning Appellant's background is not *per se* ineffectiveness. There may not have been any other facts upon which the jury could find mitigation. Counsel could only present that which exists. Aside from the age and drug use of Appellant, no other factors have been brought to this Court's attention which could have been offered in mitigation. "Actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. The defendant must show that they (particular errors) actually had an adverse effect on the defense." *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967). We cannot say that there is a reasonable probability that presentation of facts of Appellant's background would have swung the balance in favor of Appellant, especially since the jury found no mitigation in the factors that were presented to them. One of the aggravating factors found, namely the killing while in the commission of a felony, was supported by the evidence, and clearly is sufficient to warrant the death penalty.

In light of the overwhelming circumstantial evidence presented by the prosecution, we also find no basis for a conclusion that Appellant was prejudiced by the brevity of trial counsel's closing argument.

## IV. TRIAL COURT ERRORS

We now turn to Appellant's various assignments of error at trial. Appellant argues that the trial court erred in permitting the in-court identification testimony of Antoinette Quinn because Appellant believes this identification to have been tainted by a detective's comment to Ms. Quinn enroute to the preliminary hearing. Ms. Quinn asked the detective if he thought they "had the right guy" and the detective answered, "Yes, we think so." Appellant further contends that the out of court identification made of him by Michael Bradford was tainted by the improperly suggestive pre-trial procedure of showing him only one photograph, and that the Commonwealth did not establish by clear and

convincing evidence that this witness's identification at trial was reliably based on his observations at Pearson's Sporting Goods Store, and not on the overly suggestive event of showing one photograph. While "the use by police of a single photograph of a suspect in securing identification by a witness can constitute an improperly suggestive procedure," *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), "the reliability of a challenged identification is to be judged under a test employing the totality of the circumstances." The factors relevant to determining the reliability of the identification are:

> ... the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

*Commonwealth v. Ransome*, 485 Pa. 490, 496, 402 A.2d 1379, 1382 (1979).

This Court further stated in *Ransome*, that "[A]n in-court identification following an illegal out of court identification is admissible into evidence if, considering the totality of the circumstances, it is determined that the in-court identification had an independent origin 'sufficiently distinguishable to be purged of the primary taint.'" *Id.*, 485 Pa. at 497, 402 A.2d at 1383. Quoting *United States v. Wade*, 388 U.S. 218, 241, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149, 1165 (1967); and *Commonwealth v. Brown*, 462 Pa. 578, 589, 342 A.2d 84, 90 (1975).

■ Initially, we note that the Commonwealth merely requested Mr. Bradford to identify Appellant in court; no mention was made of the pre-trial identification until cross-examination. Appellant can hardly object to the admissibility of the pre-trial identification since it was introduced by defense counsel. Furthermore, our application of the totali-

ty of the circumstances test to the facts of this case assures us that the pre-trial identification was proper. Mr. Bradford had more than sufficient opportunity to view Appellant on July 13, 1982, as this was not a routine sale. There was a discussion between Mr. Bradford and Appellant regarding the correct type of ammunition for Appellant's pistol. This was followed by an exchange of the previously purchased ammunition and issuance of a credit slip to Appellant. Mr. Bradford paid close attention to Appellant, since he had to record information in the Federal Ammunition Disposition Register. He examined Appellant's driver's license and printed Appellant's name under his signature because the signature was illegible. This transaction was conducted at close range in a well-lighted business establishment. Mr. Bradford testified that he remembered the sale because it was unusual, and that he remembered Appellant because he resembles Mr. Bradford's cousin. Less than one month elapsed between the sale and the identification. Mr. Bradford never waivered in his certainty. He identified Appellant from his photograph pre-trial, and at trial, he independently identified Appellant as his customer.

The subject of Ms. Quinn's pre-trial identification of Appellant was thoroughly explored at the suppression hearing and was correctly ruled admissible. Ms. Quinn had ample time and opportunity to observe Appellant when he robbed the Good Scents shop. She gave a complete description to the police fifteen minutes later. The only change made by her from her original description was a revision in her estimate of Appellant's height. This occurred when she gave a second statement on August 10, 1982. It was at this point that she asked whether the detective thought he had the right man. At trial, she did not hesitate to identify Appellant.

Our careful review of the record satisfies us that the trial court correctly applied the totality of circumstances test and properly concluded that the in-court identification by Mr. Bradford had an origin sufficiently distinguishable from the pre-trial identification and was in no way sugges-

tive, and that the identifications made by Ms. Quinn, both pre-trial and at trial, were not in any way tainted.

█ Appellant next contends that the trial court erred in permitting testimony of other crimes, because of its overly prejudicial nature. This argument is without merit. The law on this point is clear and well-settled. Although, generally, evidence of the commission of other crimes is not admissible against a defendant who is being tried for another crime, such evidence is admissible when it tends to prove a common scheme, plan, or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others or to establish the identity of the person charged with commission of the crime on trial— in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other. When evidence is relevant and important to one of such issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value. *Commonwealth v. Clayton,* 506 Pa. 24, 483 A.2d 1345 (1984); *Commonwealth v. Green,* 488 Pa. 611, 413 A.2d 651 (1980); *Commonwealth v. Wable,* 382 Pa. 80, 114 A.2d 334 (1955).

In the instant case, there were no eyewitnesses to the killings; therefore, it was necessary for the Commonwealth to meet its burden of proof by presenting circumstantial evidence. The evidence of the Pine Street and Kirkpatrick armed robberies was of crucial importance. Robbery was apparently the motive for all three crimes. The challenged evidence showed that the same gun had been used in all three crimes, and there was ample evidence that Appellant was in possession of the gun on the relevant dates. The shootings of Nathan Cohn and Courtland Gross were similarly perpetrated. Cohn was shot in the left ankle through the back of the foot, while Mr. Gross was shot in the lower right heel apparently from the back. This tends to show that the perpetrator shot his victims in the foot and worked his way up, which modus operandi ties the crimes together. Further, Mr. Kirkpatrick was told by the robber that he

would shoot him in the leg and work his way up. Additionally, Kirkpatrick was told by Appellant that his eyes would be shot out if he tried to identify Appellant. Ms. Quinn was given a similar threat and Mrs. Gross was, in fact, shot in the eye. We find no error in admitting evidence of these prior crimes.

■ Appellant next complains that it was error for the court to place severe limitations on the cross-examination of two Commonwealth witnesses, Joseph La Motte and Franny Kelly. The scope and limits of cross-examination are largely within the discretion of the trial court and its actions pertaining thereto will not be reversed in the absence of a clear abuse of its discretion or error of law. *Commonwealth v. Schmidt*, 437 Pa. 563, 263 A.2d 382 (1970). Appellant wished to show that La Motte had lied and had provided him with an alibi at a 1978 trial in which Appellant was convicted of arson. La Motte denied lying at the prior trial, and he has never been prosecuted for perjury following the 1978 trial. The mere fact that his testimony was contradicted at the 1978 trial by that of other witnesses is inconclusive. It was within the discretion of the trial judge to cease inquiry into the matter. We find that aside from this issue, the record reveals that defense counsel was permitted extensive cross-examination on discrepancies between La Motte's various written statements and his in-court testimony.

■ As to the cross-examination of Franny Kelly, defense counsel attempted inquiry into a purely collateral matter involving a statement made by Kelly at the preliminary hearing to the effect that he found some Methamphetamine in Rittenhouse Square. The trial court correctly sustained objections to this question as a collateral matter completely unrelated to this case. As to the question, "Have you been under the care of a psychiatrist?", since defense counsel did not relate the question either to the time at which the events occurred, or to the time of trial, it was clearly irrelevant.

▆▆▆ Appellant next argues that the trial court erred by refusing to order the Commonwealth to turn over to the defense statements of various witnesses in advance of trial, contending that there were eyewitnesses and that he was entitled to their statements under Pa.R.Crim.P. 305 B(2)(a) and (b). It is clear from the record that there were no known "eyewitnesses" to the murders. We reject Appellant's interpretation of who may be considered an eyewitness. Our Superior Court recently held correctly that a person who is not actually present at the scene of a crime is not an eyewitness, and thus his identity is not discoverable under Rule 305 B(2)(a). *Commonwealth v. Wolfe*, 301 Pa. Superior Ct. 187, 200, 447 A.2d 305, 312 (1982). More recently, this Court held that Rule of Criminal Procedure 305 (B)(2), which allows discovery of non-mandatory items at the discretion of the court, covers eyewitnesses *only*, and there is no requirement that the Commonwealth disclose the names and addresses of all witnesses. *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811 (1985). Appellant admits that the Commonwealth did provide a summary of testimony which certain witnesses would give, and also provided to Appellant, at trial, for purposes of cross-examination, copies of statements of the witnesses who testified. This was all that Appellant was entitled to receive under Rule 305 (B)(2). There was no abuse of discretion in any of the court's discovery rulings.

▆▆▆ Appellant argues that it was error to refuse to hear the expert testimony of Dr. Kenneth Kool as to the effects of long-term use of Methamphetamine on one's ability to recall and perceive facts accurately. Dr. Kool's testimony was offered to impeach the testimony of Franny Kelly, a Commonwealth witness, and an admitted user of Methaphetamine. The trial court refused the testimony on the ground that it was not sufficiently specific to be probative. We agree. Kelly was not a patient of Dr. Kool's, nor did Dr. Kool ever examine him, or have personal knowledge of his drug use. Dr. Kool was not in possession of Kelly's medical or psychological/psychiatric records. There was no

evidence adduced at trial as to the length of time nor the dosages of Methamphetamine ingested by Kelly. As the trial court correctly noted, Methamphetamine use and the quantity used has different effects on different people. Therefore, generalizations in this regard are irrelevant and inaccurate. Dr. Kool's testimony would not have helped the jury determine whether *Kelly's* memory was impaired, since there was insufficient evidence upon which to base an expert opinion. It was correct to refuse the testimony of Dr. Kool.

■ Appellant next argues that it was error to refuse Appellant's demurrer to the charges of false imprisonment, terroristic threats, recklessly endangering another person, and unlawful restraint because there were no eyewitnesses and no evidence at trial to substantiate any of these charges. As this Court recently stated in *Commonwealth v. Zoller*, 507 Pa. 344, 490 A.2d 394 (1985):

> In deciding whether to grant a demurrer, the court does not determine whether or not the defendant is guilty on such evidence, but determines whether the evidence, if credited by the jury, is legally sufficient to warrant the conclusion that the defendant is guilty beyond a reasonable doubt. *Commonwealth v. De Petro,* 350 Pa. 567, 39 A.2d 838 (1944). Thus the test to be applied in ruling upon a demurrer is whether the Commonwealth's evidence and all reasonable inferences therefrom are sufficient to support a finding by the trier of fact that the accused is guilty beyond a reasonable doubt. *Commonwealth v. Wimberly,* 488 Pa. 169, 411 A.2d 1193 (1979); *Commonwealth v. Mitchell,* 460 Pa. 665, 334 A.2d 285 (1975); *Commonwealth v. Carroll,* 443 Pa. 518, 278 A.2d 898 (1971).

*Id.,* 507 Pa. at 357–358, 490 A.2d at 401. All of the prosecution's evidence, and reasonable inferences therefrom, supported the jury's finding of guilt beyond a reasonable doubt on these charges. Accordingly, we find that Appellant's demurrer to these offenses was properly refused.

■ Appellant further contends that the Commonwealth failed to prove beyond a reasonable doubt the second aggravating circumstance—that Catherine VanderVeur met her death by means of torture. We agree. Our review of the record, giving all reasonable inferences to the Commonwealth, discloses insufficient evidence to support a finding of this aggravating circumstance and we must, therefore, reverse this finding. Mrs. VanderVeur was found blindfolded and tied to a chair with tightly knotted scarves. Photographs showed that her wrists were badly bruised as a result of the restraint. However, Mrs. VanderVeur's death resulted from a single bullet wound to the head and there is no evidence to show that this killing was committed by means of torture.

■ Our Death Penalty Statute provides that if the jury finds at least *one* aggravating circumstance and no mitigating circumstances, then the verdict *must* be death. 42 Pa.C.S. § 9711(c)(1)(iv). With respect to Mrs. VanderVeur, the evidence in support of aggravating circumstance (6), 42 Pa.C.S. § 9711(d)(6), was compelling and sufficient to sustain it. While circumstance (8), 42 Pa.C.S. § 9711(d)(8), torture, is invalidated, this does not alter the conclusion that the death penalty is warranted. The jury found the presence of one aggravating circumstance as to Mr. and Mrs. Gross and one aggravating circumstance that was sustainable as to Mrs. VanderVeur, and found no mitigating circumstances; the sentence of death is therefore upheld.[11] *Commonwealth v. Beasley*, 504 Pa. 485, 475 A.2d 730 (1984).

■ Appellant next alleges that it was error to admit, both at trial and at the sentencing hearing, photographs of the victims, which he categorizes as unduly gruesome, in

11. We note that the facts of this case, at least facially, clearly present sufficient evidence to support a finding of aggravating circumstance (10), "the defendant has been convicted of another ... offense, committed ... at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable ..." 42 Pa.C.S. § 9711(d)(10). However, this was not presented by the prosecution to the jury as an aggravating circumstance and, therefore, will not be considered as such in our review.

that their potential to inflame the jury far outweighed their evidentiary value. We do not agree. The question of admissibility of photographs of a corpse in homicide cases is a matter within the discretion of the trial judge, and only an abuse of that discretion will constitute reversible error. *Commonwealth v. Hudson*, 489 Pa. 620, 414 A.2d 1381 (1980); *Commonwealth v. Batty*, 482 Pa. 173, 393 A.2d 435 (1978). A photograph of a bloody corpse in a homicide trial is not inflammatory *per se*. *Hudson, supra*, 489 Pa. at 631, 414 A.2d at 1387. Whether the photographs are admissible depend on a two step analysis. First, the court must decide whether a photograph is inflammatory in nature. "If, but only if, the photograph is deemed to be inflammatory, the Court must then apply the balancing test ... i.e., is the photograph of 'such essential evidentiary value that [its] need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.'" [Citations omitted.] *Commonwealth v. Miller*, 490 Pa. 457, 417 A.2d 128 (1980).

There are three photographs in issue, Exhibits C–11, C–13 and C–167. C–11 is a black and white photograph of Mrs. Gross lying facedown just inside the door to the pantry. C–13 is a black and white photograph of Mr. Gross sprawled on the floor with his cane by his right leg. In both these photographs, blood has drained from the victims and is visible on their bodies, their clothes, and the floor. These photos were introduced at trial during the testimony of the investigating officer. C–167 is a color photograph of Catherine VanderVeur's wrist, showing bruises caused by being bound to the chair. This photograph, taken at the morgue, was introduced during the sentencing portion of trial. The pictures were not clearly inflammatory and they were relevant, as they depicted the victims as they were found, with the wounds incurred as a result of the crimes. Further, they tended to demonstrate the position of Appellant when the fatal shots were fired, establish the commission of burglary, robbery, and felonious restraint, establish the time of the murders, establish the modus operandi of Appellant of shooting his victims in the legs first, and

establish the elements of premeditation and torture. Even if the photographs were considered to be inflammatory, their probative value clearly outweighs any prejudice to Appellant.

■ Appellant's next allegation of error is that a new trial should have been granted based upon trial counsel's discovery of an alibi witness. Appellant alleges that one Norma Alba, an associate of Avrum Kay and an employee in his store, made a statement after the trial that she could place Appellant in Philadelphia at about the time the murders were being committed in Lower Merion Township. The essence of Ms. Alba's alleged statement is that Appellant could not have committed the murders because he was in the store at the time they were being committed, waiting for Mr. Kay to return to buy stolen goods from Appellant.

After discovered evidence is a basis for a new trial if it

 (1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely for impeaching credibility of a witness; and (4) is of such nature and character that a different verdict will likely result if a new trial is granted.

*Commonwealth v. Colson, supra,* 507 Pa. at 469, 490 A.2d at 826. None of these elements was satisfied.

Trial counsel admitted at argument on post-trial motions that he learned about Norma Alba sometime during the trial, but contended that he did not know how important her testimony would be. It seems incredible that Appellant would not have known about this alleged alibi witness until six months after the event occurred to which she was a witness. Appellant offered a statement that Norma Alba made after the trial sometime in February, 1983; however, she never returned to sign it, her telephone number was disconnected, and there was no known address for her. There is simply no basis for awarding Appellant a new trial on these facts. It is clear that Norma Alba's existence as an alibi witness could have been made known by Appellant

prior to trial and her statement and appearance could have been obtained before or during trial by exercising reasonable diligence.[12]

■■■ Finally, pursuant to our statutory duty to review death cases to determine whether the imposed sentence of death is "excessive or disproportionate to the penalty imposed in similar cases," as set forth in 42 Pa.C.S. § 9711(h)(3)(iii), we have conducted an evaluation of all convictions of murder of the first degree prosecuted under the Act of September 13, 1978, P.L. 756, No. 141, 42 Pa.C.S. § 9711. We have reviewed the data and information pertaining to similar cases that have been compiled by the Administrative Office of Pennsylvania Courts (AOPC) pursuant to this Court's directive. *See, Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984). We find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, 42 Pa.C.S. § 9711(h)(3)(iii). We also find that the evidence supports the finding of an aggravating circumstance specified in subsection (d), 42 Pa.C.S. § 9711(h)(3)(ii), and that the sentences were not the product of passion, prejudice or any other arbitrary factor, 42 Pa.C.S. § 9711(h)(3)(i). Appellant argues that this Court is not capable of fulfilling its statutory duty of conducting a proportionality review because of insufficient information regarding his background—we find no merit to this argu-

12. In addition to the issues discussed in text pertaining to errors at trial, Appellant also alleged numerous other trial errors. These issues are: 1) the court erred in refusing to admit into evidence conflicting affidavits of Detective Natoli; 2) the court erred in refusing to remove a juror who was acquainted with one of the witnesses; 3) the court erred in denying Appellant's request for instruction to the jury that second degree murder carries no death penalty; 4) the court erred in refusing to charge the jury on diminished capacity at the guilt phase of the trial; 5) the court erred in dismissing, for cause, a juror who was an out of county resident; 6) the court erred in admitting testimony of police officers as to the length of time it took to go from Fourth and Chestnut Streets to Eighth and Catherine Streets and back to the Gross residence; and 7) the trial court erred in refusing Appellant's motion for a mistrial on the basis of prior non-disclosure of the testimony of a Commonwealth witness. There is no merit to any of these issues as they lack factual or legal foundation.

ment. We, therefore, affirm the convictions of murder of the first degree and the sentences of death.[13]

HUTCHINSON, J., filed a concurring opinion.

HUTCHINSON, Justice, concurring.

I join the majority opinion. I write separately only to reiterate my belief that the jury's sentence can be affirmed despite the consideration of an improper aggravating circumstance by the jury for the reasons expressed in *Commonwealth v. Holcomb*, 508 Pa. 425, 456 n. 16, 498 A.2d 833, 899 n. 16 (1985) (Opinion Announcing the Judgment of the Court).

---

**13.** The Prothonotary of the Eastern District is directed to transmit the full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court to the Governor pursuant to 42 Pa.C.S. § 9711(i).