**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DAVID WARNER | : | No. 445 EDA 2023 |

Appeal from the Order Entered January 23, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002930-2020

BEFORE:   LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, P.J.:                **FILED MAY 31, 2024**

The Commonwealth of Pennsylvania appeals from the order, entered in the Court of Common Pleas of Philadelphia County, granting David Warner's motion to suppress a photographic identification and any subsequent in-court identification.  We reverse and remand.

The suppression court set forth the underlying facts as follows:

[Warner] was arrested and charged for his alleged participation in the shooting of Andre Ford on July 3, 2020, in the rear driveway behind Ford's home on the 6200 block of Chestnut Street in Philadelphia.  After being shot six times, Ford was transported to the hospital, where he remained for six days.  **About an hour after the shooting, Ford told Police Detectives that he didn't know who shot him, but the assailant lived four houses down from his home**.  (N.T. [Suppression Hearing], 1/23/23, pp. 41-42, 70-71; Exhibit[] D-3).  On July 15, 2020, Ford met with Philadelphia Police Detective Timothy Connell about the shooting and gave a formal statement.  Ford told Detective Connell that he didn't know the name of the shooter.  Ford stated

_____

[*] Former Justice specially assigned to the Superior Court.

that he had seen that person in the area approximately ten times and they resided at 6217 Chestnut Street. Based on that information, Detectives Connell and Begley conducted a "Clear Search" on that address. The Clear Search yielded the names of several young men who resided at 6217 Chestnut Street, one of whom was [Warner]. As a result of that information, the detectives looked through their police database and printed a single, bla[c]k-and-white mugshot photograph of [Warner]. Instead of providing Ford with a photo array containing [Warner's] photo or present[ing] Ford with photographs of all the men who lived at 6217 Chestnut Street, Detective Connell showed Ford the single black-and-white mugshot of [Warner]. It wasn't until this mugshot was presented to Ford that he identified [Warner] as the shooter. (N.T. [Suppression Hearing], 1/23/23, pp. 42-48, 61-65; Exhibits C-1, D-1[,] and D-2).

During cross-examination [at the suppression hearing], Detective Connell acknowledged that his Clear Search came up with three separate addresses for [Warner] within the City of Philadelphia—6217 Chestnut Street, 1323 N. 51st Street[,] and 5529 Walton Street—and that [Warner] did not reside at any of these addresses prior to or on the date of the shooting. Detective Connell also stated that, when the police executed a search warrant at 6217 Chestnut Street, the house was empty, and no evidence was recovered. (N.T. [Suppression Hearing] 1/23/23, p. 53-72).

Aside from Ford's identification of [Warner's] mugshot, no corroborating evidence such as a gun, ballistics, DNA, fingerprints, surveillance footage[,] or independent eyewitness statements linked [Warner] to the crime. Moreover, the description Ford gave of the assa[ilant]—a Black [m]ale about 22 years old, 5'5" tall, wearing black clothing and having light facial hair—was vague and did not describe some very notable features associated with [Warner's] appearance. Despite the lack of corroborating evidence, lack of personal relationship, and the vague description of the alleged shooter, Detectives Connell and Begley insisted that they were not required to present a photo array to Ford because [Warner] was a "known doer." (N.T. [Suppression Hearing], 1/23/23, pp. 54, 76-80).

Suppression Court Opinion, 6/12/23, at 2-4 (emphasis added).

On January 23, 2023, the suppression court granted Warner's motion to suppress, reasoning that, under the totality of the circumstances, the identification procedure created "a substantial likelihood of misidentification." *Id.* at 4 (citing **Commonwealth v. DeJesus**, 860 A.2d 102, 112 (Pa. 2004). On January 30, 2023, the Commonwealth filed a motion to reconsider, which the court denied after the Commonwealth filed this appeal on February 17, 2023.[1] Both the trial court and the Commonwealth have complied with Pa.R.A.P. 1925.

The Commonwealth raises one issue for our review: "Did the [trial] court err in granting a motion to suppress the photographic identification of [Warner] as unduly suggestive, as well as any subsequent in-court identification[,] as alleged fruit of the poisonous tree?" Commonwealth's Brief, at 4.

> In reviewing an appeal by the Commonwealth of a suppression order, we may consider only the evidence from the appellee's witnesses along with the Commonwealth's evidence which remains uncontroverted. Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

**Commonwealth v. Brown**, 996 A.2d 473, 476 (Pa. 2010).

---

[1] The Commonwealth certified in its notice of appeal that the suppression court's order terminates or substantially handicaps the prosecution of this case. **See** Pa.R.A.P. 311(d). **See also** Pa.R.A.P. 904(e) ("When the Commonwealth takes an appeal pursuant to Pa.R.A.P. 311(d), the notice of appeal shall include a certification by counsel that the order will terminate or substantially handicap the prosecution.").

In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable. . . . Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors. As this Court has explained, the following factors are to be considered in determining the propriety of admitting identification evidence: "the opportunity of the witness to view the perpetrator at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation." The corrupting effect of the suggestive identification, if any, must be weighed against these factors.

*Commonwealth v. Meachum*, 711 A.2d 1029, 1034 (Pa. Super. 1998) (citations and some quotations omitted).

"Suggestiveness arises when the police employ an identification procedure that emphasizes or singles[]out a suspect." *Commonwealth v. Davis*, 17 A.3d 390, 394 (Pa. Super. 2011). However, "[a] pretrial identification will not be suppressed unless the facts demonstrate that the identification procedure was so infected by suggestiveness as to give rise to a substantial likelihood of irreparable misidentification." *Commonwealth v. Cousar*, 154 A.3d 287, 306 (Pa. 2017). *See also Commonwealth v. Fisher*, 769 A.2d 1116, 1127 (Pa. 2001); *Commonwealth v. Stiles*, 143 A.3d 968, 978 (Pa. Super. 2016).

At the suppression hearing, Detective Connell stated that he interviewed the victim on July 15, 2020, almost two weeks after the shooting. Detective Connell testified that "[t]he victim stated who shot him." N.T. Suppression

Hearing, 1/23/23, at 42. The prosecutor questioned Detective Connell with respect to the notes he had made during the interview:

> Q: Detective, do you recognize[Exhibit] C-1?
>
> A: Yes. . . . The investigative interview I conducted on [July 15], 2020 at 11:40 a.m.
>
> Q: And in that interview, did you ask Mr. Ford what happened to him?
>
> A: Yes.
>
> Q: And did you ask him who it was that was the perpetrator?
>
> A: Yes.
>
> Q: And did he describe to you who it was or how he knows him?
>
> A: Yes. . . . First, I asked him where it happened. And he told me it was in the rear driveway of 6200 Chestnut Street. **Then I asked him if he knew who shot him. And he said, yes. He lives at 6217 Chestnut Street. Then I asked him if he knew his name. And he stated no. I asked him how did he know him. He said he has lived on the block in the past. I asked him how many times had you seen him before the shooting. [He said] I've seen him about ten times the last couple months. And I know that he lives at 6217 Chestnut Street.** Based on that question, I asked Detective Begley to do a clear check on the property. And then Detective Begley notified me with a name that came up who lives in that property. It was the defendant. **We then showed the complainant a single photo—**

*Id.* at 43-44 (emphasis added). Detective Connell then went on to explain the photographic identification procedure, including those occasions when a single photo, as opposed to a photographic array, is appropriate:

> A: Depending on the case. For instance, if you had a robbery case, where the person was not known, and you got a description of the offender and—we still do a description and search the

- 5 -

database of mug shots and photos of everyone that had interaction with the victim. And after we get through we show the victim those photos. If we had a suspect by other means like on a video or get an officer who recognized him, **and if we knew that the victim didn't know the offender, we would do a six-person photo array**[.] . . . **In this particular case, the complainant was adamant because he lived on the same block for the past several months. And he knew the address**. . . . **As far as I know per our discussion we believe that the victim knows the offender. And he described what he described by saying that he's known him for several months. He's seen him ten times in the last month he stated. He said I know he lives at 6217 Chestnut Street.**

Q:  Did you suggest to the witness that the person in the photograph was the shooter?

A:  No.

Q:  Did you suggest to the witness that the person in the photograph was the occupant of the address you provided?

A:  No.

*Id.* at 45-48 (emphasis added). On cross-examination, Detective Connell clarified:

If [the] complainant didn't know the person who shot him I wouldn't have shown him any photos at all. He said he knew the person who shot him. He said he'd seen him. He lives at that location. And he'd seen him over ten times in a month's period of time. The victim[,] Andre Ford[.] was believable because he came to us saying he wanted to be interviewed. And he wanted to identify the person who shot him.

*Id.* at 68.

Significantly, what is overlooked by both the suppression court and Warner, and what is uncontradicted in the record, is a portion of the investigative interview, introduced as Exhibit C-1 at the suppression hearing,

- 6 -

regarding a confrontation between Warner and Ford that occurred prior to the shooting. Therein, Ford reported the following:

> Earlier in the night there were several people outside setting off fireworks. **He was one of them**. I went out to ask them to keep it down with the fireworks. My [redacted] is 98 years old. I told them to keep it down because it sounded like gunshots. We had some words and I went in the house. Around 2:30 in the morning, I went outside to go to my girl[']s house. **I went out the back door and two guys were waiting for me. The guy who I had words with had a firearm and said[,"D]on't run oldhead.["] I ran and he shot me six times.** Once in the back, once on the side, and twice in the stomach, one time in the butt and one time in the right leg.

N.T. Suppression Hearing, 1/23/23, at p. 43, (Exhibit C-1) (emphasis added).

Based on the totality of the circumstances, the Commonwealth represents that the procedure used by Detectives Connell and Begley did not render the identification unreliable because the photograph used was only found by the Detectives *after* utilizing identifiers provided by the victim/complaining witness. Further, the Commonwealth asserts that the record shows that there is clear and convincing evidence that the identification was reliable because there was an independent basis for the identification, namely, the victim's prior knowledge of Warner and his statement to police that Warner was one of the several people setting off fireworks and one of the two men he confronted earlier that very evening about the fireworks disturbing the elderly person in his home. We agree with the Commonwealth's assessment.

Here, the victim "knew" Warner, although he did not know his name, and had an opportunity to observe Warner both before and during the relevant incident. These facts more than sufficiently outweigh any suggestiveness resulting from the showing of the single photograph to the witness. *See Commonwealth v. Buehl*, 508 A.2d 1167, 1178-79 (Pa. 1986) (pretrial identification procedure proper despite police having only showed witness photograph of appellant where witness had good opportunity observe him at relevant time). We do not find these circumstances "so infected by suggestiveness that there is an irreparable likelihood of misidentification." *Commonwealth v. Bell*, 562 A.2d 849, 852 (Pa. Super. 1989). Even though the single photo may have been suggestive, the identification was nonetheless reliable because the witness "knew" who Warner was. The procedure utilized by Detectives Connell and Begley, though not ideal, was not so suggestive "as to give rise to a substantial likelihood of irreparable misidentification." *Cousar*, 154 A.3d at 306. *See also Commonwealth v. Jaynes*, 135 A.3d 606, 610 (Pa. Super. 2016) (due process does not require every pretrial identification be conducted under laboratory conditions of approved lineup). Accordingly, we conclude the suppression court erred in granting Warner's motion to suppress.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/31/2024