817 A.2d 1060

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Jose BUSANET, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 6, 2000.

Decided Dec. 19, 2002.

Reargument Denied March 20, 2003.

Luis Felipe Restrepo, Lawrence Samuel Krasner, Philadelphia, Jose Busanet.

John P. Ellington, Iva C. Dougherty, Norristown, for Commonwealth of PA.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

Justice CASTILLE.

On February 19, 1999, following a three-day capital jury trial, appellant was convicted of first-degree murder,[1] aggravated assault causing serious bodily injury,[2] aggravated assault with a deadly weapon,[3] two counts of reckless endangerment,[4] and possessing an instrument of crime.[5] In addition, appellant was convicted of conspiracy to commit first-degree murder, conspiracy to commit aggravated assault, and conspiracy to commit reckless endangerment.[6] At the penalty phase, the jury found one aggravating circumstance and no mitigating circumstances; accordingly, it returned a sentence of death.[7] Trial counsel subsequently withdrew from the case and present counsel entered their appearance and filed post-verdict motions on appellant's behalf in which they claimed, *inter alia*, that trial counsel had been ineffective. Following an evidentiary hearing, the post-verdict motions were denied on December 22, 1999. This direct appeal followed. For the reasons set forth below, the judgment of sentence is affirmed.

## I. Sufficiency of the Evidence

In all cases where the death penalty has been imposed, this Court conducts a review of the sufficiency of the evidence underlying the first-degree murder conviction. *See*

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S. § 2702(a)(1).

3. 18 Pa.C.S. § 2702(a)(4).

4. 18 Pa.C.S. § 2705.

5. 18 Pa.C.S. § 907(a).

6. 18 Pa.C.S. § 903(a)(1), (2).

7. The aggravating circumstance found by the jury was that, in the commission of the offense, appellant knowingly created a grave risk of death to another person in addition to the victim of the offense. 42 Pa.C.S. § 9711(d)(7). Appellant pursued three mitigating circumstances: (1) the age of the defendant at the time of the crime, 42 Pa.C.S. § 9711(e)(4); (2) the defendant's participation in the homicidal act was relatively minor, 42 Pa.C.S. § 9711(e)(7); and (3) any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8). The jury found none to be present.

*Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (Pa.1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).[8] In reviewing the sufficiency of the evidence, we must determine whether the evidence and all reasonable inferences derived therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the jury's finding of all of the elements of the offense beyond a reasonable doubt. *See Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217, 1218 (Pa.1986). Evidence is sufficient to sustain a conviction for first-degree murder where the Commonwealth establishes that the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the person accused was responsible for the killing; and that the killing was done with premeditation or deliberation. *See* 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624, 626 (Pa.1991). "A specific intent to kill may be proven by circumstantial evidence; it may be inferred by the use of a deadly weapon upon a vital part of the victim's body." *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (Pa.2000) (citing *Commonwealth v. Bond*, 539 Pa. 299, 652 A.2d 308, 311 (Pa.1995)). Each member of a conspiracy to commit murder may be convicted of first degree murder, regardless of which of the conspirators inflicted the fatal wound, where the elements of first degree murder are made out as to that conspirator. *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 500 (Pa.1995); *Commonwealth v. Joseph*, 451 Pa. 440, 304 A.2d 163, 168 (Pa.1973).

■ Here, Wilson Melendez testified that, in the spring of 1997, he began selling crack cocaine for appellant who was a drug dealer in Reading, Pennsylvania. Melendez also shared an apartment with appellant. Sometime in May of 1997, Melendez was present when another individual who sold drugs for appellant named "Celo" informed appellant that Jason

8. Appellant has also, in "an abundance of caution," alleged in his brief that "the evidence presented was insufficient to convict [him] of the charges brought against him," although this allegation is unaccompanied by any argument. Thus, we confine our review to the sufficiency of the evidence to prove first degree murder.

Bolton had stolen his chain and money. After Celo related this information to appellant, appellant went to confront Bolton. When appellant returned, he told Melendez that he was going to kill Bolton. Sometime later, appellant again told Melendez that he was going to kill Bolton because he was tired of Bolton "messin' with his peoples."

Melendez testified that, one night in late May of 1997, appellant left the apartment armed with a handgun and wearing a bulletproof vest. When he returned, appellant informed Melendez that he had just gone to Bolton's house with a friend and that he had "shot the house up."

Melendez further testified that, on June 11, 1997, he was walking to a laundromat when appellant called to him from the second floor window of LaDonna Johnson's house. Melendez knocked on the door of the house and was admitted by Richard Boxley. At appellant's request, Melendez and Boxley left the house to purchase two bags of marijuana and two Phillies Blunt cigars. While Melendez and Boxley were attempting to buy marijuana, they saw Bolton and Tyrone Bryant walking down the street. When Melendez informed Boxley that one of the men was Bolton, Boxley ran to get appellant.

A short time later, Melendez encountered appellant and Boxley and informed them which way Bolton had gone. Melendez, Boxley and appellant then followed Bolton and Bryant for several blocks, during which time appellant stated that he was going to kill Bolton in broad daylight. After Bolton and Bryant had rounded the corner onto Sixth Street, appellant asked Melendez to look around the corner to see where Bolton was.

When Melendez looked around the corner, he saw Bryant speaking to someone on the second floor of a house. He also saw three people across the street at a church, four children playing outside and a woman sitting on a porch. Melendez testified that appellant told Boxley to approach Bolton first because Bolton would not recognize him. As Boxley was walking toward Bolton, his gun went off in his back pocket.

Bolton looked at Boxley and stepped onto the porch. Boxley then began running toward Bolton and firing his gun. Appellant fired two shots at Bolton as well. Boxley chased Bolton up onto the porch and fired shots at him through the door of the building. Bolton was fatally wounded.

Melendez testified that, following the shooting, the three men returned to Johnson's house where appellant asked Boxley, Are you sure you got him? Thereafter, at appellant's instruction, Melendez hid the firearms used by appellant and Boxley at his mother's house. These firearms, a 9 millimeter Ruger and a Sturm Ruger double action revolver, were subsequently recovered by the police and were introduced into evidence at appellant's trial.

Tamika Johnson also testified at appellant's trial. She related that she was present at LaDonna Johnson's house on the morning of June 11, 1997, and that she overheard appellant tell Boxley that Bolton had forty-eight hours to live because Bolton had held up one of his boys. Later that day, while she was at a neighbor's house, Johnson heard sirens and saw appellant, Melendez and Boxley running on Chestnut Street away from the direction of Sixth Street, the scene of the shooting. When she returned to LaDonna Johnson's house, Tamika Johnson saw appellant, Melendez and Boxley celebrating and yelling, Yeah, we got that nigger. Tamika Johnson testified that appellant instructed her to go to the crime scene and determine whether Boxley was dead. She did so, and, when she returned to LaDonna Johnson's home and informed appellant that the victim was going to die, Boxley appeared "scared to death" while appellant and Melendez remained happy.

Trooper Kurt Tempinski of the Pennsylvania State Police, an expert in toolmarks, ballistics and firearms, testified that bullet fragments and shell casings recovered from the crime scene matched the 9 millimeter Ruger and Sturm Ruger revolvers recovered by the police. In addition, the Commonwealth introduced into evidence a statement appellant gave to New York City police on July 1, 1997, in which he admitted, among other things, that he used a 9 millimeter Ruger during

the incident, that three young children were present at the scene of the shooting, and that he fired two shots at Bolton. In a statement appellant made to the Reading police, he again admitted that he had shot twice at Bolton. At trial, appellant identified the firearms introduced by the Commonwealth as those he and Boxley had used in the shooting.

The foregoing evidence is sufficient to establish beyond a reasonable doubt that Jason Bolton was unlawfully killed pursuant to a conspiracy in which appellant played an active part, including himself firing shots at the victim, which fully warranted a conclusion that he harbored a specific intent to kill. We now turn to appellant's specific claims of error.

## II. Ineffective Assistance of Counsel

Appellant raises a total of seven claims of ineffective assistance of trial counsel during both the guilt and penalty phases.[9] Appellant forwards his claims under both the federal and

9. With the exception of appellant's claim that trial counsel was ineffective for failing to present certain mitigation evidence during the penalty phase, none of his ineffective assistance of counsel claims were raised in post-verdict motions, which represented the first opportunity for present counsel to raise these issues. Accordingly, these claims ordinarily would be waived. *See Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687, 695 n. 6 (Pa.1977) (claims of ineffective assistance of prior counsel must be brought at earliest stage where counsel whose ineffectiveness is questioned no longer represents defendant). Appellant's claims that trial counsel was ineffective for (1) failing to object to the trial court's failure to comply with Pa.R.E. 604 and Pa.R.E. 702 when using an interpreter during the penalty phase, (2) failing to object to the trial court's penalty phase instructions based on *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and (3) failing to object to the trial court's failure to instruct the jury that the Commonwealth must prove each element of each aggravating circumstance beyond a reasonable doubt ordinarily would be independently waived because appellant did not include these issues in his statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b). *See Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306, 309 (Pa.1998) ("Any issues not raised in a 1925(b) statement will be deemed waived.").

Such waivers, of course, undermine this Court's ability to engage in effective appellate review. For example, trial counsel was present and testified at the post-verdict hearing, on the claim of ineffectiveness that was timely raised, but there was no inquiry respecting the new claims of ineffectiveness now leveled at him. In addition, the 1925(b) waiver deprives this Court of the trial court's views on these claims. Nevertheless, because this is a direct appeal in a capital case, and because the

the Pennsylvania Constitutions. He does not argue that the right to counsel implicated by his claims differs under those charters, instead forwarding a single argument as to each claim. In any event, it is well-settled that the test for counsel ineffectiveness is the same under both charters: It is the performance and prejudice test as set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Bell v. Cone*, 535 U.S. 685, 694–697, 122 S.Ct. 1843, 1850–52, 152 L.Ed.2d 914 (2002); *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (Pa.1987).[10] To prevail on a claim that counsel was constitutionally ineffective, the appellant must overcome the presumption of competence by showing that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceeding would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 333 (Pa.1999).[11] A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *See Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 701 (Pa.1998) ("If it is clear that Appellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met."); *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 357 (Pa.1995).

record provides an adequate basis to resolve the merits of these claims, we will proceed to address their substance.

10.  In *Pierce*, this Court recognized that the *Strickland* test was the proper test to evaluate ineffectiveness claims raised under the Pennsylvania Constitution. The Third Circuit has likewise recognized that Pennsylvania's standard for assessing claims of counsel ineffectiveness is materially identical to *Strickland*. *Werts v Vaughn*, 228 F.3d 178, 203–04 (3d Cir.2000).

11.  Although the test for ineffectiveness in Pennsylvania is the same as *Strickland's* two-part performance and prejudice standard, in application this Court has subdivided the performance inquiry into three distinct parts.

■■■■■■■

## A. Guilt Phase Claims

■■■■ Appellant raises two claims of ineffectiveness of counsel during the guilt phase. Appellant first alleges that trial counsel was ineffective for failing to present an opening statement to the jury. He asserts in summary fashion that, "[t]here can be no logical reason to waive an opening statement in a capital case," and that the prejudice which resulted from this "unreasonable trial tactic" was "incalculable." Trial counsel, however, cannot be deemed ineffective *per se* for failing to make an opening statement. *See Commonwealth v. Rawles,* 501 Pa. 514, 462 A.2d 619, 624 (Pa.1983) (failure to make opening statement is within realm of sound trial strategy). Appellant has not offered to prove why trial counsel in this case must be deemed to have had no reasonable basis for declining to give an opening statement. As the trial court noted in its well-reasoned opinion below, trial counsel could have had any number of perfectly reasonable strategic reasons for not giving an opening statement: "Perhaps the best of these is the fact that there was some uncertainty as to where the Commonwealth's evidence might lead in this case [and][i]f the Defense were to have made an opening outright denying the guilt of the Defendant, or averring a different version of facts than those presented, this might have destroyed the credibility of Defense Counsel and endangered their case." Opinion at 9–10. Nor has appellant attempted to demonstrate how it is that, but for his trial counsel's waiver of the opening statement, there is a reasonable probability that the outcome of his trial would have been different. Because appellant has failed to rebut the constitutional presumption that counsel was effective, this claim fails.

■■■■ Appellant next claims that trial counsel rendered ineffective assistance when he questioned appellant, who testified in his own behalf during the guilt phase, about his prior convictions, as follows:

Q: Now, before we get into your testimony, I'd like to just ask you some questions. In 1991, you had a conflict with the law; is that correct?

A: Yes, I did.

Q: And that resulted in a conviction for robbery?

A: Yes.

Q: And there was something else, was there not? An assault?

A: No, a robbery.

Q: Was there any—was there any other conviction?

A: Oh, yes.

Q: Tell the jury what it was, please.

A: It occurred on Rikers Island.

Q: What was it?

A: It was a[n] assault on an inmate.

N.T. 2/17/99 at 341. Appellant contends that, because the prior assault conviction did not involve dishonesty or false statement, the Commonwealth would not have been able to impeach him with it. See Pa.R.Evid. 609(a) ("For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime . . . shall be admitted if it involved dishonesty or false statement.").[12] He asserts that, if trial counsel had not introduced this conviction in his direct examination of appellant, the jury would not otherwise have been exposed to it. Appellant argues that trial counsel's decision to elicit this assault conviction on direct examination "impeached" his client, was, therefore, "absurd," and "could under no circumstances be construed as a reasonable trial strategy." Initial Brief of Appellant at 58. Appellant asserts that counsel's error was not harmless, and that the prejudiced he suffered is "obvious."

In response, the Commonwealth does not dispute that it would not have been able to introduce the assault conviction to attack appellant's credibility. The Commonwealth instead notes that counsel had a formidable task as he was faced with appellant's multiple inculpatory statements as well as eyewitness and cohort testimony. Against that evidence was ar-

12. Appellant does not dispute that the robbery conviction would have been admissible under Rule 609(a) as a *crimen falsi* offense.

rayed appellant's contrary testimony. The Commonwealth argues that counsel reasonably introduced evidence of the prior conviction in an attempt to show his client's candor and willingness to take responsibility for his past misdeeds which, in turn, rendered his defense against the instant charges more believable to the jury. In addition, the Commonwealth argues that appellant has failed to prove prejudice, echoing the trial court's finding that, in light of the overwhelming evidence of guilt, counsel's introduction of the prior conviction had no impact on the verdict.

Assuming that this claim has arguable merit and that counsel lacked a reasonable basis for his conduct, we agree with the trial court that appellant has not proven that he was prejudiced by counsel's action in introducing the assault conviction. In arguing prejudice, appellant simply relies upon this Court's decision in *Commonwealth v. Williams,* 524 Pa. 404, 573 A.2d 536 (Pa.1990). In *Williams,* this Court held that the trial court had erred in permitting the Commonwealth to impeach the defendant with prior convictions that did not involve dishonesty or false statement, *i.e.,* resisting arrest, assault and carrying firearms on public streets, and that such error was not harmless. That the improper admission of a defendant's prior non-*crimen falsi* convictions proffered by the Commonwealth for the purpose of impeaching the testifying defendant's credibility may be harmful reversible error, however, is not dispositive of the distinct question of whether a defendant was prejudiced as a result of his counsel's unreasonable introduction of such evidence for a different purpose. As this Court has recognized:

> The harmless error standard ... which places the burden on the Commonwealth to show that the error did not contribute to the verdict beyond a reasonable doubt is a lesser standard than the [ineffective assistance of counsel] prejudice standard, which requires the defendant to show that counsel's conduct had an actual adverse effect on the outcome of the proceedings. This distinction appropriately arises from the difference between a direct attack on error occurring at trial and a collateral attack on the stewardship

of counsel. In a collateral attack, we first assume that counsel is effective and that not every error by counsel can or will result in a constitutional violation of a defendant's Sixth Amendment right to counsel.

*Commonwealth v. Howard,* 538 Pa. 86, 645 A.2d 1300, 1307 (Pa.1994) (citation omitted).

We are satisfied that there is not a reasonable probability that the misstep by trial counsel had an actual adverse effect on the outcome of the trial. Appellant does not allege that the Commonwealth exploited the evidence of his prior assault in *any* fashion, impeachment or otherwise. In point of fact, the exchange with counsel marked the only time during the course of the trial that the assault conviction was referenced. Although both trial counsel and the trial court later discussed other of appellant's prior convictions, neither mentioned the assault at Riker's Island. N.T. 2/17/99 at 438, 447. Importantly, the Commonwealth never argued to the jury that the prior conviction was a basis to reject appellant's testimony on credibility or other grounds. The fact that the reference was not introduced by the Commonwealth to impeach, that it was isolated and not exploited, combined with the strength of the Commonwealth's evidence—including the testimony of Wilson Melendez and Tamika Johnson, the ballistics evidence linking appellant to the shooting, and appellant's own inculpatory statements to the police—strongly indicate that, even in the absence of the non-exploited evidence concerning the Riker's Island assault, appellant would still have been convicted.

## B. Penalty Phase Claims

Appellant argues that his trial counsel, who was trying his first capital case, was ineffective in his alleged "complete failure" to investigate and present mitigation evidence during the penalty phase.[13] Specifically, appellant claims that trial counsel failed to interview ten of appellant's friends and family members and failed to present their character testimony at

13. Although trial counsel did not present additional evidence at the penalty phase, he did incorporate the record of the guilt phase and present a closing argument.

the penalty hearing. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v. Washington*, 466 U.S. 668, 690–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *reh'g denied*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). The testimony of the putative witnesses at the post-verdict evidentiary hearing made clear that their testimony concerned appellant's alleged good character, *i.e.*, that he was a good family man and the like. Thus, the issue of whether counsel was ineffective in failing to interview these particular witnesses turns on whether such character testimony would have been beneficial.[14]

Appellant's assertion that counsel failed to even investigate or consider presenting this character testimony in mitigation is contradicted by the post-verdict record. At the evidentiary hearing, trial counsel testified that, after consulting with appellant, the defense consciously chose not to pursue character testimony at the penalty phase because of a joint concern that such testimony would "open the door" to the Commonwealth presenting and arguing the evidence of appellant's bad character, including appellant's convictions for robbery and for the assault while incarcerated at Riker's Island, and additional evidence that he was involved with the "Bloods"

14. In arguing that trial counsel was ineffective for allegedly failing to even investigate mitigation evidence, appellant relies upon *Commonwealth v. Perry*, 537 Pa. 385, 644 A.2d 705 (Pa.1994) and *Commonwealth v. Weiss*, 530 Pa. 1, 606 A.2d 439 (Pa.1992). In *Perry*, the appellant's trial counsel was found ineffective because he failed to interview appellant prior to the trial and failed to prepare for the death penalty hearing. In *Weiss*, counsel was found ineffective because he failed to investigate character evidence after the appellant had inquired about the absence of witnesses. In that circumstance, counsel was deemed to have breached his duty to consult with his client. As the discussion in the text makes clear, the actions by trial counsel *sub judice* are distinguishable from *Perry* and *Weiss*. For example, trial counsel discussed his mitigation strategy with appellant, and he explained his reasons for not pursuing the courses that form the basis for appellant's present challenges. Moreover, we note that counsel incorporated the record from trial as a basis upon which to deliver his penalty phase closing, and he prepared and delivered a substantive argument to the jury during the penalty hearing.

street gang and that he was involved in another assault while he was incarcerated at the Berks County jail. N.T. 12/17/99 at 91–92.

This Court noted in *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (Pa.1986), that "[a]lthough evidence of good character may not be rebutted by evidence of specific acts of misconduct, a character witness may be cross-examined regarding his knowledge of particular acts of misconduct by the defendant to test the accuracy of his testimony and the standard by which he measures reputation." *Id.* at 382–83. Although the bare fact of appellant's robbery and assault convictions were elicited by counsel during the guilt phase, no details of these crimes were presented, nor was there argument concerning what they revealed of appellant's character. Among the details not shared with the jury was the fact that the Riker's Island incident involved the stabbing of two prison guards. N.T. 12/17/99 at 23, 41, 47, 92. Meanwhile, no evidence at all concerning the assault in the Berks County jail or appellant's gang affiliations had been introduced. In addition, the trial court noted that there was sufficient evidence to permit the Commonwealth to cross-examine appellant's character witnesses concerning his activities as a drug dealer to test the accuracy and basis for their testimony. *See* Opinion at 14. In addition to the fact that appellant's character witnesses would have been subject to such substantial impeachment, the trial court, which heard the testimony of the witnesses at the post-verdict hearing, noted that, in his view, they were "largely incredible." *Id.* This was so because, while the witnesses claimed to be close to appellant, they revealed such a convenient, or perhaps even "feigned," unawareness of his criminal activities, or the extent or specifics of them, as to be "simply unbelievable." *Id.* In light of these circumstances, we see no error in the trial court's determination that counsel's concern that the foregone character testimony would have opened the door to substantial, damaging evidence was reasonably based. Since counsel had an objectively reasonable basis for determining that the evidence would have done more harm than good, this claim fails.

In addition, appellant faults counsel for his alleged failure to consider, investigate and present evidence of appellant's "mental health history." [15] Appellant bears the burden of demonstrating that relevant evidence actually existed in this regard. *See Commonwealth v. Howard*, 553 Pa. 266, 719 A.2d 233, 238 (Pa.1998) ("[T]his Court has declined to find counsel ineffective for failing to proffer testimony from a mental health professional to establish a mitigating circumstance where there is no showing that such testimony was indicated by evidence of mental illness."); *Commonwealth v. Smith*, 544 Pa. 219, 675 A.2d 1221, 1234 (Pa.1996) (Opinion Announcing Judgment of Court) ("[T]rial counsel is not ineffective for failing to submit evidence of mitigation where no such evidence exists.") (citing *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167, 1177 (Pa.1986)).

Here, appellant failed to present any evidence at the post-verdict evidentiary hearing which shows that he suffers from any specific mental illness or defect that might have mitigated the crime. Appellant's mental health expert, Dr. William Russell, who was unable to interview appellant because appellant refused to meet with him, offered no diagnosis of mental disorder that might have been advanced in mitigation. N.T. 12/19/99 at 15.[16] Appellant now adverts to the fact that trial counsel did not secure evidence regarding appellant's "commitment history and mental health history." Initial Brief of Appellant at 19. But, as the trial court found, the juvenile medical and mental health records introduced at the hearing below revealed "no significant diagnosed mental disorder." [17]

15. Appellant does not cite the specific statutory mitigating circumstance to which this evidence would relate. Presumably, he means to invoke the catch-all mitigator. *See* 42 Pa.C.S. § 9711(e)(8). Appellant does not suggest that there was foregone evidence which could have established the more specific circumstance of an inability "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." *Id.* § 9711(e)(3).

16. Appellant raises a separate claim arising from the fact that, when he belatedly indicated a willingness to meet with Dr. Russell, the trial court denied a continuance to allow for that evaluation. That claim is discussed separately below.

17. The trial court reasoned as follows:

Appellant does not dispute the accuracy of the trial court's analysis; he just recites the history that his expert adverted to below, including hospitalizations before age one, early head trauma, a significant language disability at age nine, a learning disability, out of home placements, and a mental health history dating to age nine. Initial Brief of Appellant at 34. But these facts regarding appellant's childhood do not ineluctably prove that he suffered from a mental condition, or endured an upbringing, that necessarily would have mitigated the seriousness of the murder at issue. To prove counsel ineffective, appellant needs to show that the course not taken offered a better prospect for a favorable outcome than the one that was actually chosen. Appellant has not proven that such is the case here.

This is particularly so because, contrary to appellant's assertion that counsel did not even consider or investigate mental health evidence in mitigation, the post-verdict record reveals, and the trial court found, Opinion at 15–17, that trial counsel did consider that course. At the hearing below, counsel noted that he was aware from his discussions with his client that appellant had some history of psychiatric problems in his background. Counsel explained at some length his reasons for not pursuing such evidence at the penalty phase:

> Because quite honestly, the jury I think on their own reached a conclusion, as every one of us could, that obviously someone who is in that, is in the line of work that he is in and settles his differences by shooting people is a person who is psychiatrically and psychologically dysfunctional, not

The strongest assertion we have found in those records is that [appellant] has oppositional disorder, Attention Deficit Disorder with Hyperactivity and Mixed Developmental Disorder . . ., and this diagnosis occurred more than ten years prior to the date of trial. Our knowledge of these conditions finds none of them to be serious. Furthermore, [appellant's] own mental health expert, Dr. William Russell[,] was unable to diagnose [appellant] with any mental disorder. . . . Based on this evidence, we conclude that [appellant] has failed to show that he has any current significant mental disorder. As [appellant] has no disorder, we believe it would have been pointless for Defense Counsel to pursue a mental health expert for [appellant's] penalty phase.

Opinion at 15 (record citations omitted).

insane, not unaccountable for his actions. It wouldn't be hard to draw that conclusion.

I don't see what we would gain by putting that evidence in.

* * *

Because [mental health mitigation evidence] would be directly contrary to the other evidence that came in in the case where he seemed to be wheeling and controlling the whole, frankly, the whole murder operation. He's telling them to go down and see whether or not the person is dead. He's giving orders as to what to do with the guns. He's obviously in a position where he's in some kind of—the impression that you would get from the testimony is in some kind of control of the situation.

* * *

I based my decision on what I felt was a sound trial strategy. And also I based my decision upon the fact that I felt that [at] the penalty stage perhaps the most important overriding consideration of all was that the attorney had to be completely honest and straightforward with the jury.

Perhaps more importantly, the jury had to feel that the attorney was completely honest and straightforward with them, and that if the attorney tried to behave in [a] manipulative, trick[y], dishonest, or deceptive way, it would only harm the client.

And under the egregious facts, operative facts of this case to put before the jury, for instance, that a sentence should be altered or modified because, as an example, reading the expert's report that at nine years old he had reading difficulties would be an argument so totally dishonest it would insult the intelligence of the jury and infuriate them to the detriment of the client.

N.T. 12/17/99 at 95–96, 100, 107–08.

This Court cannot say that the trial court erred in concluding that trial counsel's concerns that mental health mitigation

evidence would have been inconsistent with the other evidence adduced at trial, would be disbelieved by the jury, and could well alienate the jury and damage appellant's cause, were objectively reasonable. *See Commonwealth v. Abdul–Salaam,* 808 A.2d 558, 561 & n. 4 (Pa.2001) (trial counsel had reasonable basis for not presenting mental health mitigation evidence at penalty phase where counsel believed that jury would view such evidence as inconsistent with fact that considerable planning went into perpetration of crime, defendant had wherewithal to attempt to escape, and defendant returned to scene of crime for no reason other than to open fire). In this regard, we note also that the trial court's decision is consonant with this Court's recognition that "[a] defendant's effort to present evidence of a troubled childhood is not always productive as it might be viewed as an attempt to trivialize a brutal murder." *Commonwealth v. Pirela,* 556 Pa. 32, 726 A.2d 1026, 1035 (Pa.1999).

Appellant's reliance upon the United States Supreme Court's decision in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), in advancing this claim is misplaced. In *Williams,* the Court upheld a Virginia state trial judge's finding on collateral review that counsel were ineffective under *Strickland v. Washington* for failing to investigate and present mitigation evidence. In so holding, the Court noted that counsel had failed to even investigate "records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* at 395, 120 S.Ct. 1495. The evidence that Williams' counsel failed to locate included evidence memorialized in "documents prepared in connection with Williams' commitment when he was 11 years old that dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was 'borderline mentally retarded,' and suffered repeated head injuries, and might have mental impairments organic in origin." *Id.* at 370–71, 120 S.Ct. 1495. The Court further described Williams' "night-

marish childhood," as it was memorialized in his juvenile records, as follows:

Juvenile records contained the following description of his home:

"The home was a complete wreck.... There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash.... The children were all dirty and none of them had on under-pants. [The parents] were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them.... The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey."

*Id.* at 395 n. 19, 120 S.Ct. 1495 (citations to record omitted). After concluding that counsel had no tactical basis for failing to investigate this information, the Court agreed with the assessment of the Virginia trial judge—"the very judge who presided at Williams' trial and who once determined [as required under Virginia law] that the death penalty was 'just' and 'appropriate' "—that there was a reasonable probability that the result of the sentencing phase might have been different if the jury had heard this evidence. *Id.* at 396–97, 120 S.Ct. 1495.

This case is distinguishable from *Williams*. The childhood evidence cited by appellant, which counsel failed to secure and produce, is of a different nature and quality than the evidence of borderline mental retardation and the "nightmarish" upbringing that counsel in *Williams* failed to present. Furthermore, unlike *Williams*, counsel here did not fail to pursue what evidence there was because he misunderstood Pennsylvania law, but because, in light of the evidence already presented in this case revealing appellant's controlling role in the crime, he did not think such evidence would have persuaded this jury. And finally, here, unlike in *Williams*, the judge

below, the same jurist before whom the case was tried, concluded that the claim lacks merit.[18]

Appellant next claims that counsel was ineffective during the penalty hearing because he failed to object when the Spanish/English interpreter was not sworn in, as required by Pa.R.Evid. 604, or specifically qualified as an expert under Pa.R.Evid. 702. The record reflects that the Commonwealth called Marcelino Rosa to testify to the risk others faced during the shooting. Mr. Rosa's testimony was translated from Spanish to English by Marzela Herrera–Weaver, a full-time court interpreter for the Berks County court system. Ms. Herrera–Weaver was not sworn by the trial court prior to conducting the translation, nor was she specifically qualified on the record of this case as a translator. Trial counsel lodged no objection to the failure to swear or qualify Ms. Herrera–Weaver on the record.

Appellant has failed to demonstrate that an objection would have benefited him. According to the trial court, as an official court interpreter for Berks County, Ms. Herrera–Weaver was previously sworn in through her general oath as a court interpreter. Although the trial court could not recall exactly

18. We note that *Williams* is not the last word from the High Court concerning the application of the *Strickland* standard to claims of ineffective assistance of counsel at the penalty phase of a capital trial. In *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), defense counsel did not produce any additional mitigation evidence at the penalty phase and made a strategic decision to waive final argument in the penalty phase in order to prevent the lead prosecutor from arguing in rebuttal. On appeal, the state prisoner (Cone) argued that ineffective assistance of counsel should be presumed in these circumstances under *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), because counsel failed to subject the State's call for the death penalty to meaningful adversarial testing. The Court rejected that claim, holding that "the failure to adduce mitigating evidence and the waiver of closing argument—are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland*." *Bell*, 535 U.S. at 695–697, 122 S.Ct. at 1851–52. Moreover, on the merits of the claim of counsel's ineffectiveness in failing to produce any mitigation evidence and in waiving argument, the Court held that the state court's resolution was not an objectively unreasonable application of *Strickland* and, thus, denied federal habeas relief. *Bell* suggests that there are few, if any, absolutes in this area and that each case, of necessity, will turn upon its specific facts.

when Ms. Herrera–Weaver swore that oath, we note that, under our precedent, she was not required to be sworn in every time she acts as a court interpreter. *See Commonwealth v. Kauffman*, 193 Pa.Super. 364, 165 A.2d 692, 698–99 (Pa.Super.1960) (holding that official court interpreter is not required to be sworn in every time he acts in his official capacity). Additionally, appellant does not allege that Ms. Herrera–Weaver was unqualified to serve as an interpreter. Accordingly, he has not demonstrated that if counsel had objected, the result would have been exclusion of her as an interpreter. Instead, the likely result apparently would have been to have her sworn on the record and to have her qualifications stated and accepted. Counsel was not required to lodge a pointless objection.

Further, appellant notes that the prosecutor cut short his direct examination of Mr. Rosa because of what he perceived to be problems in translation resulting from the fact that Mr. Rosa was of Puerto Rican descent and Ms. Herrera–Weaver was of Mexican descent. But the fact that the prosecutor abandoned his direct examination of Mr. Rosa in no way demonstrates that appellant was prejudiced by trial counsel's failure to object when Ms. Herrera–Weaver served as a court interpreter without being sworn in and qualified on the record. If anything, appellant may have benefited from the prosecutor's difficulties in communicating with this witness, as he admitted at a sidebar that he was unable to elicit some of the testimony he had hoped Mr. Rosa would provide. N.T. 2/19/99 at 525.[19]

19. At the end of his discussion of this issue in his brief, appellant alleges that his right to confront the witnesses against him under the federal and Pennsylvania Constitutions was "compromised" by the fact that Ms. Herrera–Weaver was not sworn-in and qualified on the record. But appellant never explains how this was so. Since, as noted above, appellant has not shown that Ms. Herrera–Weaver was actually *unqualified* to translate, it is difficult to understand his present complaint. Moreover, appellant, a Spanish-speaking person of Puerto–Rican descent, does not point to any aspect of Mr. Rosa's testimony that he was unable to understand, nor does he offer to demonstrate how, in fact, his ability to cross-examine Mr. Rosa was hampered in any way.

██ Appellant's third claim of ineffectiveness during the penalty phase assails trial counsel for failing to object to the trial court's penalty phase instructions pursuant to *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (jurors must be free to consider any mitigating evidence regardless of whether jury unanimously agrees on mitigating evidence). Specifically, appellant contends that the trial court's use of the pronoun you during the penalty phase charge was vague and could have created the misimpression among the jury that mitigating circumstances had to be found unanimously. The portion of the penalty phase charge which appellant contends is objectionable follows:

> By contrast, the defendant must prove any mitigating circumstance. However, he only has to prove it by a preponderance of the evidence; that is, by the greater weight of the evidence. Put the evidence on a scale. Imagine a scale. One side is the aggravating. One side is the mitigating. And does it tip ever so slightly on the one side. Actually, with regard to this part here, the proof of the mitigating circumstance, you put whatever mitigating circumstance and the evidence supporting that on one side of the scale and the evidence against supporting it and, depending on how that is weighed, then you decide whether a mitigating circumstance has been proven by a preponderance of the evidence or not.

> \* \* \*

> Now, in this case under the Sentencing Code, the following matters if proven to your satisfaction by a preponderance of the evidence can be—can be mitigating circumstances, the age of the defendant.... So that is a fact before you for your consideration as to whether or not it is a mitigating circumstance. The second possible mitigating circumstance, that the defendant's participation in the homicidal act was relatively minor. And the third is any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

N.T. 2/19/99 at 551–53.

██ It is well-established that appellate review of a trial court charge must involve a consideration of the charge as a

whole to determine whether it was fair and complete. *See Commonwealth v. Saunders,* 529 Pa. 140, 602 A.2d 816, 818 (Pa.1992). Later in its charge to the jury at the penalty phase, the trial court unequivocally instructed the jury as follows:

When voting on the general findings, you are to regard a particular aggravating circumstance as present only if all of you agree that it is present. On the other hand,—now this is very important—there are two possible aggravating circumstances. You must decide whether all of you agree that any one of those or both of them or none of them have been proven beyond a reasonable doubt before you can go into the weighing analysis or go any further before you could really reach the ultimate decision on death. *However, with regard to a mitigating circumstance, only if one of you feels, believes that the defendant has proven a particular mitigating circumstance,—and three possible are listed, okay, three possible are listed for you—then a mitigating circumstance has been proven.* And, therefore, in order to return a sentence of death, the aggravating circumstance must outweigh any mitigating circumstance that has been identified *by one of you, not all 12, but just one. This different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentences. It gives a defendant the full benefit of any mitigating circumstances.*

N.T. 2/19/99 at 554–55 (emphasis added). Thus, the charge, when viewed in its entirety, clearly instructed the jury that *any* mitigating factor found by *one* juror must be weighed against aggravating factors unanimously found by all the jurors. These instructions unquestionably fulfilled the mandate of *Mills.* Additionally, the verdict slip provided to the jurors instructed them to list the mitigating circumstance(s) found by *one* or more of us. Thus, there was not a reasonable likelihood that the jurors in [appellant's] case understood the challenged instructions to preclude consideration of relevant mitigating evidence offered by petitioner. *Boyde v. California,* 494 U.S. 370, 385, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

Because appellant's underlying claim of a *Mills* violation is meritless, counsel cannot be deemed ineffective for failing to object to the charge. *See, e.g., Commonwealth v. DeHart,* 539 Pa. 5, 650 A.2d 38, 41 (Pa.1994).

Appellant next claims that trial counsel was ineffective for failing to object to the trial court's failure to instruct the jury that the Commonwealth must prove each element of each aggravating circumstance beyond a reasonable doubt. The trial court gave the following instruction concerning the Commonwealth's burden of proof with respect to aggravating factors:

> The Commonwealth must prove any aggravating circumstance beyond a reasonable doubt. This does not mean that the Commonwealth must prove the aggravating circumstance beyond all doubt and to a mathematical certainty. A reasonable doubt is the kind of doubt that would cause a reasonable and sensible person to hesitate before acting upon an important matter in his own affairs. A reasonable doubt must be a real doubt. It may not be one that a juror imagines or makes up to avoid carrying out an unpleasant duty.

N.T. 2/19/99 at 550–51. We are aware of no decision from this Court or any other court—and appellant does not cite one— that requires the court to charge that "each element" of an aggravating circumstance must be proved beyond a reasonable doubt. We note that the charge *sub judice* was consonant with Pennsylvania Suggested Standard Criminal Jury Instruction 15.2502F(2), and clearly, adequately, and accurately described to the jury the Commonwealth's burden of proof with respect to aggravating circumstances. Because there was no basis in existing law for counsel to forward the objection appellant faults him for failing to forward, counsel cannot be deemed ineffective. Finally, appellant has not demonstrated that, but for counsel's alleged error here, there is a reasonable probability that he would not have been sentenced to death. Accordingly, this claim fails.

## C. Cumulative Ineffectiveness

Citing to no authority, state or federal, appellant asserts that he is entitled to relief due to the cumulative effect of the foregoing alleged instances of ineffective assistance of counsel. It is settled, however, that "no number of failed claims may collectively attain merit if they could not do so individually." *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 948 (Pa.2001) (quoting *Commonwealth v. Williams*, 532 Pa. 265, 615 A.2d 716, 722 (Pa.1992)). Because appellant has failed to demonstrate that any of his claims warrant relief individually, they do not do so when considered *in toto.*

## III. Trial Court Error at the Post–Verdict Evidentiary Hearing

Appellant's next claim is that the trial court erred in refusing to interrupt the post-verdict evidentiary hearing and grant another defense continuance in order to allow appellant to be examined by his own mental health expert, Dr. Russell. Prior to the evidentiary hearing, appellant had refused to meet with Dr. Russell. During the evidentiary hearing, however, appellant apparently changed his mind about meeting with Dr. Russell and requested a continuance of the hearing so that he could do so. N.T. 12/17/99 at 26–27. The trial court denied the request.

The denial of a request for a continuance is within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. *Commonwealth v. McAleer*, 561 Pa. 129, 748 A.2d 670, 673 (Pa.2000). An abuse of discretion is not merely an error of judgment; rather, discretion is abused when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record." *Id.* (citations omitted). The docket reflects that appellant requested and was granted three extensions of time to file his post-verdict motions with the trial court. A fourth motion, filed jointly with the Commonwealth, requested a continuance of the post-verdict evidentiary hearing due to the unavailability of Dr. Russell. This

request was also granted by the court. In total, appellant had over eight months before the evidentiary hearing to meet with Dr. Russell had he wished to do so. In its opinion, the trial court noted that:

Defendant was given more than adequate time to consent to an exam and failed to do so. We do not believe that our Court system should be held hostage by a fickle Defendant who cannot cooperate with his own counsel. The reason this continuance was denied was because of Defendant's own actions, and for those actions Defendant must be held accountable.

Opinion at 23. The trial court also noted that it denied the continuance because, *inter alia*, it was cognizant of its obligation to rule promptly upon post-trial motions in death penalty cases. *Id.* (citing Pa. R.Crim. P. 720 and 810).

We are satisfied that the trial court did not abuse its discretion in denying appellant's request for a fifth continuance, raised in the middle of the evidentiary hearing, merely because appellant apparently experienced a change of heart concerning the advisability of cooperating with his own expert witness. Accordingly, this claim is denied.

## IV. Statutory Review

Finally, this Court is required to conduct a statutory review of the death sentence. Pursuant to 42 Pa.C.S. § 9711(h)(3), this Court must affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d).

*Id.* After careful review of the record below, we conclude that the sentence imposed was not a product of passion, prejudice or any other arbitrary factor. Moreover, the evidence produced at trial was sufficient to establish the aggravating factor found by the jury: *i.e.,* that appellant knowingly created a grave risk of death to another person in addition to the victim of the offense. 42 Pa.C.S. § 9711. Since the jury found one

aggravating factor and no mitigating factors, it was statutorily required to impose a sentence of death. 42 Pa.C.S. § 9711(c)(1)(iv).

Accordingly, we affirm the verdict and sentence of death imposed upon appellant by the Court of Common Pleas of Berks County.[20]

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Justice SAYLOR files a concurring opinion in which Chief Justice ZAPPALA joins.

Justice SAYLOR.

## CONCURRING OPINION

I join the Majority Opinion, save for the discussion concerning Appellant's claim that trial counsel was ineffective in failing to investigate and present evidence of Appellant's mental health history. In this regard, counsel testified during the post-verdict evidentiary hearing that he had "learned in very, very general terms from talking to [Appellant] that there was some kind of psychiatric problem;" however, counsel did not view such information as significant and did not believe that its introduction would have made any difference. Other than this general discussion with Appellant, counsel made no effort to ascertain the nature and extent of Appellant's mental health history. Moreover, apart from asserting that Appellant's role as an accomplice in the killing diminished his culpability and warranted the imposition of a life sentence as opposed to the death penalty, counsel did not introduce any mitigating evidence. Counsel justified such inaction based upon the belief that the proposed mental health evidence would have been inconsistent with the Commonwealth's proof that Appellant

20. The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence, and review by the Supreme Court pursuant to 42 Pa.C.S. § 9711(i).

"seemed to be wheeling and controlling the whole, frankly, the whole murder operation."

As the majority acknowledges, "strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). Where, as here, counsel foregoes investigation, his judgment must be "directly assessed for reasonableness in all the circumstances," while at the same time affording a heavy measure of deference to his decision. *Id.*[1] Such assessment includes, *inter alia,* a comparison of the defense offered with that which the defendant has proposed. *See generally Moore v. Johnson,* 194 F.3d 586, 616–18 (5th Cir.1999) (evaluating the reasonableness of counsel's asserted strategic basis for failing to investigate and present available mitigation evidence in conjunction with such proof).[2] Although a decision to not develop and present certain evidence may be deemed reasonable where such evidence is inconsistent with the defense theory, *see, e.g., Commonwealth v. Williams,* 557 Pa. 207, 250–51, 732 A.2d 1167, 1190 (1999), in this case, the defense theory was premised upon diminished culpability associated with Appellant's status as an accomplice. Evidence of Appellant's emotional or mental health problems was not necessarily opposed with this theory, as such information may have been viewed by the jury as rendering him less culpable. *See Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106

1. Courts in other jurisdictions have, however, generally declined to deem a strategic decision reasonable where counsel has failed to investigate. *See, e.g., Baxter v. Thomas,* 45 F.3d 1501, 1514 (11th Cir.1995); *Ex parte Land,* 775 So.2d 847, 853–54 (Ala.2000); *People v. Coleman,* 168 Ill.2d 509, 214 Ill.Dec. 212, 660 N.E.2d 919, 933 (Ill. 1995).

2. This is not to say that a claim of ineffectiveness can succeed through a hindsight comparison of the trial strategy employed with an alternative not pursued. *See Commonwealth v. Howard,* 553 Pa. 266, 274, 719 A.2d 233, 237 (1998). At the same time, however, where it can be demonstrated that an alternative not chosen offered a potential for success substantially greater than the course actually pursued, a finding that a given strategy lacked a reasonable basis may be warranted. *See id.*

L.Ed.2d 256 (1989) (stating that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse").[3]

Nevertheless, I agree with the majority and the trial court that Appellant failed to demonstrate prejudice, as he refused to meet with the mental health expert retained following trial, thus preventing him from rendering an opinion or diagnosis bearing upon particular mitigating circumstances. In this regard, given the circumstances, including the continuances offered and opportunities provided to Appellant to submit to examination, I also support the trial court's decision to deny a further continuance to permit examination after Appellant finally acceded.

Chief Justice ZAPPALA joins this concurring opinion.

---

3. With regard to the majority's discussion of *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), it should be noted that, in *Bell*, the jury had been instructed for purposes of the sentencing proceeding to consider evidence from the guilt phase of the trial, during which counsel presented significant mental health evidence from a clinical psychologist, a neuropharmacologist, and the defendant's mother concerning the defendant's substance abuse and post-traumatic stress disorder related to his military service in Vietnam. *See id.* at 690, 122 S.Ct. at 1848. Also during the guilt phase, counsel elicited testimony that the defendant had expressed remorse for the killings. *See id.* While counsel did not re-introduce such evidence during the penalty phase, in cross-examining a prosecution witness, counsel brought out that the defendant had been awarded a bronze star in Vietnam. *See id.* Thus, in contrast with the present matter, counsel in *Bell* placed before the jury considerable evidence of mitigation.